OPINION OF THE COURT
Meyer, J.
On these appeals we conclude that when all of the stockholders of a Delaware corporation agree that, except as specified in their agreement, no "business or activities” of the corporation shall be conducted without the consent of a minority stockholder, the agreement is, as between the original parties to it, enforceable even though all formal steps required by the statute have not been taken. We hold further that the agreement made by the parties to this action was violated when the corporation entered into two agreements without the minority stockholder’s consent but was not violated by the *97 formation of two subsidiaries, the minority stockholder’s consent having been obtained, and that the consent provision continues in existence as provided in the agreement. The order of the Appellate Division should, therefore, be modified, with costs to plaintiffs, as hereafter indicated.
Defendant Lombard-Wall Incorporated ("Lombard”) was owned by Equimark Corporation. Wishing to acquire Lombard, defendant Kurtz, a dealer in unregistered securities, caused a corporation originally known as H-K Entreprises, Inc., the name of which was later changed to Lombard-Wall Group, Inc. ("Group”), to be formed under Delaware law. Kurtz was the sole stockholder of Group, but neither Kurtz nor Group could provide the $4,000,000 needed to acquire Lombard from Equimark. It was in fact acquired with a short-term loan from a Swiss bank, shortly thereafter repaid from Lombard’s cash, loaned by Lombard to Group on Group’s noninterest bearing note.
Since Lombard’s business required book assets at the full value of $4,000,000 and Group had no assets other than Lombard’s stock, Group’s note to Lombard was secured by a nonrecourse guarantee from Half Moon Land Corporation, of which plaintiff Zion is the principal shareholder, collateralized by California lands owned by Half Moon. The loan agreement recited that Half Moon had made no representation as to the value of the land and Lombard and Group agreed that should Lombard’s accountants require additional acts or documents in order to maintain the value of the note, they would pay to Half Moon in advance all expenditures necessary to meet the accountants’ requirements.
At the time the note, loan agreement and guarantee were entered into Zion, Kurtz and Group entered into a stockholders’ agreement. Zion and Kurtz were the sole stockholders of Group at that time, Zion holding class A stock and Kurtz, class B.[1] Section 3.01(a) of the agreement expressly provided that without the consent of the holders of class A stock:
*98 "Anything in its Certificate of Incorporation or By-Laws to the contrary notwithstanding, the Corporation[2] shall not:
"(a) Engage in any business or activities of any kind, directly or indirectly, whether through any Subsidiary or by way of a loan, guarantee or otherwise, other than the acquisition and ownership of the stock of L-W as contemplated by this Agreement, provided, however, that the Corporation or LW may obtain and pay the premiums for, and shall be the beneficiary of, term life insurance, if obtainable, on the lives of the Purchaser, Kurtz and such other executive personnel of the Corporation and/or L-W, and in such amounts, as the directors of the Corporation or L-W may from time to time approve or as otherwise expressly provided in this Agreement.”
Notwithstanding that provision, Group and Lombard some eight months thereafter, at the suggestion of Group’s accountants, entered into an agreement which made the previously noninterest bearing loan from Lombard to Group bear interest provided interest could be paid out of earnings, and an escrow agreement with Chase Manhattan Bank pursuant to which Group deposited $580,000 in bonds to secure payment of the note. The two agreements were authorized by Group’s board over Zion’s objection.
The stockholders’ agreement also provided for escrow of the class B stock, Zion’s attorneys being the escrow agent designated in the separately executed escrow agreement. On October 15, 1976, Zion signed on behalf of Half Moon and the class A stockholders letters consenting to the formation by Group of two wholly owned subsidiaries, Lombard-Wall Services, Inc., and Lombard-Wall Management Corporation. In both letters Lombard agreed to execute an appropriate amendment to the escrow agreement with Zion’s attorneys by which the shares of the two subsidiaries would be held subject to the same escrow agreement as was the class B stock. The two corporations were formed on December 9, 1976, following a resolution of Group’s directors, adopted unanimously at a meeting attended by Zion, which ratified formation of the subsidiaries "subject to the Amendment to the Shareholders’ Agreement and subject to the approval of the majority of the Class A stockholders.” Disagreement thereafter arose between the parties concerning what was an appropriate amendment to *99 the escrow agreement, and no such agreement has ever been executed.
Plaintiffs thereafter began this action for declaratory and injunctive relief, asking in their first cause of action that the interest and escrow agreements executed without Zion’s consent be declared in violation of the stockholders’ agreement and annulled, and in the second cause of action that the formation of the subsidiaries be declared in violation of the agreement and that they be dissolved. Defendants’ answer in addition to a number of affirmative defenses stated a counterclaim for reformation on the ground that if the stockholders’ agreement prohibited execution of the interest and escrow agreements the stockholders’ agreement "did not set forth the actual understanding and agreement of the parties.”
Plaintiffs moved for severance of and summary judgment on their first cause of action and for summary judgment dismissing the counterclaim. Defendants cross-moved for summary judgment dismissing the second cause of action. Special Term, finding issues of fact as to both causes of action, denied both motions. The Appellate Division reversed, concluding that defendants were entitled to summary judgment dismissing the second cause of action, but that plaintiffs were entitled to summary judgment dismissing the counterclaim and on their first cause of action declaring that execution of the interest and escrow agreements violated the shareholders’ agreement and should be enjoined.
Just prior to the Appellate Division decision Group made the final payment on the note and caused the escrow agreement with Chase Manhattan to be released. On defendants’ motion to the Appellate Division reciting those facts, that court filed a supplemental memorandum amending its previous decision to limit relief on the first cause of action to the declaration of a past violation. The order entered by the Appellate Division, and the judgment entered pursuant to it by the county clerk so declare, but state that the above-quoted provision of the agreement has expired by its terms and that any declaration as to future violation of it "is moot, there no longer being an agreement capable of future violation.”
For the reasons hereafter stated we conclude (1) that under Delaware law, which governs, the provision proscribing corporate action without the consent of a minority stockholder is not against the public policy of that State and under the circumstances of this case is enforceable even though not *100 incorporated in the corporation’s charter, (2) that plaintiffs are entitled to summary judgment declaring that execution of the interest and escrow agreements violated the shareholders’ agreement, (3) that plaintiffs are entitled to judgment dismissing the reformation counterclaim, (4) that defendants are entitled to judgment dismissing the second cause of action, without prejudice, however, to such action as plaintiffs may be advised to take to obtain the deposit in escrow of the shares of the two subsidiaries, and (5) that though plaintiffs are not entitled to injunctive relief on the present complaint, the interest and escrow agreements having terminated, payment of the note did not terminate the restriction on corporate action by Group without consent of the class A stockholders. The Appellate Division order should, therefore, be modified as in (4) and (5) above indicated, and, as so modified, should be affirmed.
I
The stockholders’ agreement expressly provided that it should be "governed by and construed and enforced in accordance with the laws of the State of Delaware as to matters governed by the General Corporation Law of that State”, and that is the generally accepted choice-of-law rule with respect to such "internal affairs” as the relationship between shareholders and directors (cf. Greenspun v Lindley, 36 NY2d 473, 478; see Restatement, Conflict of Laws 2d, § 302, Comment g). Subdivision (a) of section 141 of the General Corporation Law of Delaware provides that the business and affairs of a corporation organized under that law "shall be managed by a board of directors, except as may be otherwise provided in this chapter or in its certificate of incorporation.” Included in the chapter referred to are provisions relating to close corporations, which explicitly state that a written agreement between the holders of a majority of such a corporation’s stock "is not invalid, as between the parties to the agreement, on the ground that it so relates to the conduct of the business and affairs of the corporation as to restrict or interfere with the discretion or powers of the board of directors” (§ 350) or "on the ground that it is an attempt by the parties to the agreement or by the stockholders of the corporation to treat the corporation as if it were a partnership” (§ 354), and further provides that "The certificate of incorporation of a close corporation may provide that the business of the corporation *101 shall be managed by the stockholders of the corporation rather than the board of directors” and that such a provision may be inserted in the certificate by amendment if "all holders of record of all of the outstanding stock” so authorize (§ 351).
Clear from those provisions is the fact that the public policy of Delaware does not proscribe a provision such as that contained in the shareholders’ agreement here in issue even though it takes all management functions away from the directors. Folk, in his work on the Delaware Corporation Law, states concerning section 350 that "Although some decisions outside Delaware have sustained 'reasonable’ restrictions upon director discretion contained in stockholder agreements, the theory of § 350 is to declare unequivocally, as a matter of public policy, that stockholder agreements of this character are not invalid” (at p 518), that section 351 "recognizes a special subclass of close corporations which operate by direct stockholder management” (at p 520), and with respect to section 354 that it "should be liberally construed to authorize all sorts of internal agreements and arrangements which are not affirmatively improper or, more particularly, injurious to third parties” (at p 526).
Defendants argue, however, that Group was not incorporated as a close corporation and the stockholders’ agreement provision was never incorporated in its certificate. The answer is that any Delaware corporation can elect to become a close corporation by filing an appropriate certificate of amendment (Del General Corporation Law, § 344) and by such amendment approved by the holders of all of its outstanding stock may include in its certificate provisions restricting directors’ authority (ibid., § 351). Here, not only did defendant Kurtz agree in paragraph 8.05(b) of the stockholders’ agreement to "without further consideration, do, execute and deliver, or cause to be done, executed and delivered, all such further acts, things and instruments as may be reasonably required more effectively to evidence and give effect to the provisions and the intent and purposes of this Agreement”, but also as part of the transaction by which the Half Moon guarantee was made and Zion became a Group stockholder, defendant Kurtz, while he was still the sole stockholder and sole director of Group, executed a consent to the various parts of the transaction under which he was "authorized and empowered to execute and deliver, or cause to be executed and delivered, all such *102 other and further instruments and documents and take, or cause to be taken, all such other and further action as he may deem necessary, appropriate or desirable to implement and give effect to the Stockholders Agreement and the transactions provided for therein.” Since there are no intervening rights of third persons, the agreement requires nothing that is not permitted by statute, and all of the stockholders of the corporation assented to it, the certificate of incorporation may be ordered reformed, by requiring Kurtz to file the appropriate amendments, or more directly he may be held estopped to rely upon the absence of those amendments from the corporate charter (Matter of Farm Inds., 41 Del Ch 379, 392-397; Beresovski v Warszawski, 28 NY2d 419; Elyea v Lehigh Salt Min. Co., 169 NY 29, 33; Lorillard v Clyde, 86 NY 384, 389; Kent v Quick-Silver Min. Co., 78 NY 159, 187; Millspaugh v Cassedy, 191 App Div 221; see Delaney, The Corporate Director: Can His Hands Be Tied In Advance, 50 Col L Rev 52, 66).[3]
The result thus reached accords with the weight of authority which textwriter F. Hodge O’Neal tells us sustains agreements made by all shareholders dealing with matters normally within the province of the directors (1 Close Corporations, § 5.24, p 83), even though the shareholders could have, but had not, provided similarly by charter or by-law provision sanctioned by statute (ibid., § 5.19, pp 73-74). Moreover, though we have not yet had occasion to construe subdivision (b) of section 620 of the Business Corporation Law,[4] which did *103 not become effective until September 1, 1963, it is worthy of note that in adopting that provision the Legislature had before it the Revisers’ Comment[5] that: "Paragraph (b) expands the ruling in Clark v. Dodge, 269 N. Y. 410, 199 N. E. 637 (1936), and, to the extent therein provided, overrules Long Park, Inc. v. Trenton-New Brunswick Theatres Co., 297 N. Y. 174, 77 N. E. 2d 633 (1948), Manson v. Curtis, 223 N. Y. 313, 119 N. E. 559 (1919) and McQuade v. Stoneham, 263 N. Y. 323, 189 N. E. 234 (1934).” Thus it is clear that no New York public policy stands in the way of our application of the Delaware statute and decisional law above referred to (cf. Grad v Roberts, 14 NY2d 70; 3 White, New York Corporations [13th ed], par 620.01[1]; Kessler, Shareholder-Managed Close Corporation Under the New York Business Corporation Law, 43 Fordham L Rev 197; Hoffman, New Horizons For The Close Corporation in New York Under Its New Business Corporation Law, 28 Brooklyn L Rev 1, 9-10).
II
Defendants’ arguments against summary judgment for plaintiffs on the first cause of action center on the use in section 3.01 of the word "engage”, which they suggest involves continuity of action rather than a single act, the presence of other proscriptions that would be unnecessary if section 3.01(a) by itself gave Zion an absolute veto over corporate action, and the purpose of the guarantee which was to maintain the $4,000,000 value of Group’s note to Lombard.
The difficulty with limiting the provision to multiple action is that though in many contexts "engage” does denote more than a single transaction (People v Bright, 203 NY 73; Black’s Law Dictionary [4th ed], p 622),[6] its meaning is necessarily governed by the context in which it is used. Defendants’ argument ignores the fact that the parties agreed, as indicated by what they wrote, that without Zion’s consent Group would not engage in "any business or activities of any kind, directly or indirectly, whether through any Subsidiary or by way of a loan, guarantee or otherwise” (emphasis supplied). As we have held in Randall v Bailey (288 NY 280, 285; accord Shilbury v Board of Supervisors of County of Sullivan, 54 Misc 2d 979, *104 982 [Cooke, J.]), the word "any” means "all” or "every” and imports no limitation. It is difficult to imagine (short, as the old chestnut puts it, of adding in the opening clause of section 3.01 after "Corporation” the word "positively”) a more comprehensive proscription than one against "any business or activities of any kind, directly or indirectly”. The more so is that true of a paragraph which then excepts two specifics— acquisition of Lombard stock and insurance on the lives of key personnel — the first of which was a one-time rather than a multiple transaction.
Nor can it successfully be argued that because the additional proscriptions against sale or pledge of Lombard stock, merger with any corporation other than Lombard, amendment of Group’s certificate of incorporation and issuance of additional stock are set forth in subdivisions of section 3.01 lettered (b) through (e) rather than as additional subparagraphs of subdivision (a) the broad sweep of the latter must be held limited because the former would otherwise be meaningless. So to hold puts an extraordinary premium on the form of outlining rather than the substance of content, but more importantly overlooks the necessity of such protections for a minority stockholder-guarantor in Zion’s position. Any careful legal draftsman, intent upon protecting his client’s interests and familiar with the history, for example, of contract indemnification clauses from Thompson-Starrett Co. v Otis Elevator Co. (271 NY 36) through Levine v Shell Oil Co. (28 NY2d 205) and Margolin v New York Life Ins. Co. (32 NY2d 149), would make indelibly clear that the (b) through (e) proscriptions were "expressed in unequivocal terms” (Thompson-Starrett, supra, at p 41), even though they were encompassed by the language of subdivision (a), lest a court conclude that by subdivision (a) alone "the parties must have meant something else” (Levine, supra, at p 211).
The purpose of the guarantee provides no stronger a basis for reading into subdivision (a) or the contract as a whole the right to enter into the interest and escrow agreements without Zion’s consent. The stockholders’ agreement makes reference to the loan agreement between Group, Lombard and Half Moon. While the loan agreement spells out the importance of the Group note continuing to be valued at the-guaranteed amount as adjusted from time to time, the purpose of that provision, as its wording makes clear, is to protect Half Moon against a claim that it made a representation as to the value *105 of the California real estate and to require that Group and Lombard pay to Half Moon any sums required by Lombard’s independent accountants to be expended for additional documentation, subdivision, zoning change or easement. Having expressly agreed that they would take specific action to support the value of the note should their independent accountants require it, defendants cannot now argue that the accountants’ view that the interest and escrow agreements were necessary to support the value of the note authorized them to enter into such agreements without Zion’s consent, though not expressly excepted from the proscription of section 3.01(a).
The intention of the parties being determinable from the words of their written agreements, interpretation of those agreements was for the court and summary judgment based on that interpretation was proper (Mallad Constr. Corp. v County Fed. Sav. & Loan Assn., 32 NY2d 285, 291).
III
What has been so far written disposes also of the contention that there was any mutual mistake warranting reformation of the contract. The extensive and intricate provisions of the various interrelated documents executed by the parties make crystal clear that this was an arm’s length transaction in which plaintiffs sought the protection of a veto over any "business or activities” of Group other than those expressly spelled out in the stockholders’ agreement. Defendants, of course, were not required to accede to the provision, but then neither was Zion obligated to provide Half Moon’s guarantee. That Kurtz may not have foreseen the necessity for the interest and escrow agreements the accountants later thought required at best establishes a unilateral mistake on his part in not negotiating for a further exception to Zion’s veto power. Nothing in defendants’ papers other than the conclusory allegations that should the court interpret the provisions of section 3.01(a) as Zion does "then there was a mutual mistake of fact” because Zion’s interpretation "is utterly contrary to the basic understanding of all parties” suggests any legal basis for reformation and those allegations are, of course, insufficient to defeat summary judgment on the counterclaim.
IV
With respect to the second cause of action, however, the *106 shoe is on the other foot. While the consents to formation of the two subsidiaries were granted by indorsement on letters from Lombard reciting Lombard’s agreement to appropriate amendment of the escrow with Zion’s attorneys to cover the subsidiaries’ shares issued to Lombard, the first suggestion that consent was conditioned upon the actual deposit of stock was not made until more than a month thereafter in a letter from Zion’s attorneys. The fact that the shares could not be issued until the corporations were formed indicates that the deposit of the stock was not intended as a condition of consent, and that would be the usual construction of the language of the letters, which are phrased in terms of promise rather than condition (cf. Weisner v 791 Park Ave. Corp., 6 NY2d 426, 434; Borax v Borax, 3 AD2d 404, 405, affd without discussion of the point 4 NY2d 113; see Restatement, Contracts 2d, [Tent Draft No. 7], § 253, subd [2], and Comment d; 3A Corbin, Contracts, § 663; 5 Williston, Contracts [3d ed], §§ 664, 665). Moreover, the corporate resolution authorizing formation of the subsidiaries "subject to” the consents which defendants already had is insufficient to create an issue of fact on that score.
Summary judgment was, therefore, properly granted to defendants on the second cause of action, but since as indicated below the consent agreement has not terminated, dismissal of the second cause of action should be stated to be without prejudice to such further action as plaintiffs may be advised to take to obtain escrow deposit of the shares of the subsidiaries. Unless that is done it will not be clear that in dismissing the second cause of action the court has not passed upon whether performance of the escrow deposit agreement may be had.
V
The Appellate Division’s conclusion that there was no longer any agreement capable of future violation was based upon Group’s payment to Lombard of the balance due on the note which defendants contend terminated the "loan period” during which section 3.01 was by its terms to remain in effect. Plaintiffs argue that the "loan period” as defined in the stockholders’ agreement did not end until Group no longer had any obligation, contingent or otherwise, to Half Moon and that Half Moon’s assertion of a claim for attorneys’ fees is still unpaid. It is unnecessary to pass upon that question for article *107 IV of the agreement expressly states that, with stated exceptions, the provisions of section 3.01 are applicable even after the "loan period” has expired.
Notwithstanding that fact plaintiffs are not entitled to injunctive relief in this action, predicated as its only remaining cause of action is on execution of the interest and escrow agreements. Those agreements having been terminated, there simply is no need for an injunction to terminate them. The court has not overlooked the statements in plaintiffs’ brief that defendants breached section 3.01 by Group’s borrowing to pay off the note and that a separate action for a declaration to that effect has been begun. Whether plaintiffs are correct in that contention and if so whether injunctive relief is warranted must await determination of that action, however, and furnishes no basis for injunctive relief in this action.
That is true, however, not because section 3.01 has terminated but because the interest and escrow agreements have been terminated. It was, therefore, error for the Appellate Division on the basis of the papers before it to direct judgment declaring section 3.01 terminated. Accordingly, its order must be modified by deleting that direction.
For the foregoing reasons the order of the Appellate Division should be modified, as above indicated.

. The agreement prohibited transfer of stock by Zion and Kurtz except by a so-called "exempt transfer”. Exempt transfers were made by each, but the agreement required any transferee to accept its terms and defendant’s affidavit recites that transfers made by himself as well as by Zion were made subject to the terms, restrictions and conditions of the agreement. Moreover, the, agreement provided that during the lifetime of Zion any consent of class A stock should be given by Zion and during the lifetime of Kurtz any consent of class B stock should be given by Kurtz. The opinion, therefore, speaks of Zion and Kurtz as though they were in fact the sole stockholders during all of the events referred to.

. In the agreement "Corporation” refers to Group and "L-W” to Lombard.

. The fallacy of the dissent is that it converts a shield into a sword. The notice devices on which the concept of the dissent turns are wholly unnecessary to protect the original parties, who may be presumed to have known what they agreed to. To protect an original party who has not been hurt (indeed, has expressly agreed to the limitation he is being protected against and affirmatively covenanted to see to it that all necessary steps to validate the agreement were taken) because a third party without notice could have been hurt had he been involved can only be characterized as a perversion of the liberal legislative purpose demonstrated by the Delaware statutes quoted in the text above.

. That provision reads: "(b) A provision in the certificate of incorporation otherwise prohibited by law because it improperly restricts the board in its management of the business of the corporation, or improperly transfers to one or more shareholders or to one or more persons or corporations to be selected by him or them, all or any part of such management otherwise within the authority of the board under this chapter, shall nevertheless be valid: (1) If all the incorporators or holders of record of all outstanding shares,. whether or not having voting power, have authorized .such provision in the certificate of incorporation or an amendment thereof; and (2) If, subsequent to the adoption of such provision, shares are transferred or issued only to persons who had knowledge or notice thereof or consented in writing to such provision.”

. (1961 Legis Doc No. 12, at p 40.)

. But note that Black’s Fifth Edition (at p 474) drops that part of the definition which states that more than a single transaction is denoted by "engage”.