**Caroline A. DAVIS, Plaintiff,**

v.

**William D. RONDINA, William Rondina, Inc., Grace Rose and The Connaught Group, Ltd., Defendants.**

**No. 90 Civ. 1774 (MGC).**

United States District Court, S.D. New York.

July 16, 1990.

## OPINION AND ORDER

CEDARBAUM, District Judge.

Caroline Davis, owner of twenty-five percent of the shares of The Connaught Group, Ltd., brings this diversity action for a preliminary injunction, a permanent injunction, declaratory relief and damages. She alleges that she is being irreparably harmed by the conduct of William Rondina, the owner of the other seventy-five percent of the shares of Connaught, who breached the shareholders agreement between them.[1] After a three day evidentiary hearing addressed solely to the issue of interim relief, I find that plaintiff is entitled to a preliminary injunction.

### FACTS

## I. FORMATION AND STRUCTURE OF THE CORPORATION

Caroline Davis and William Rondina met while working for Doncaster, Inc., a women's clothing company. Doncaster is a direct sales company which markets women's clothing through a national network of sales consultants who sell the clothing from their homes. William Rondina owns a company, William Rondina, Inc. ("Rondina, Inc."),[2] which manufactured clothing for Doncaster as an independent contractor. He also designed clothing. Caroline Davis held several positions with Doncaster. She began as a sales consultant and achieved the position of regional sales manager before she resigned. Davis also was very active in charitable organizations and held leadership positions in the Junior League which gave her a network of contacts across the country.

During the early 1980's, Rondina and Davis decided to leave Doncaster and form their own direct sales women's clothing company patterned on Doncaster's mode of operation but with a more expensive line of clothing. Rondina was to bring his manufacturing and designing experience to the venture; Davis was to contribute her contacts and her marketing experience. The plan, which was carried out, was for the new company to purchase all of its clothing from Rondina, Inc., which Rondina would continue to run, while Davis developed a network of women across the country to sell the clothing, and focused on advertising and promoting the clothing.

Their company, The Carlisle Collection, Ltd. ("Carlisle"), was incorporated in Delaware in 1981. The name of the company was changed in 1989 to The Connaught Group, Ltd. ("Connaught"). Rondina and Davis are its only shareholders; Rondina holds seventy-five percent of the stock, Davis, twenty-five percent.[3]

At the inception of the corporation, Rondina and Davis entered into a shareholders

---

1. The complaint also contains shareholders derivative claims against the other three defendants. No preliminary injunction has been sought on those claims.

2. William Rondina currently owns ninety percent of the shares of Rondina, Inc. Grace Rose owns the other ten percent.

3. This was the original division of the shares. At one point, however, ten percent of the shares of the corporation were issued to Grace Rose, reducing the proportional shareholdings of Rondina and Davis to sixty-seven and one half percent and twenty-two and one half percent, respectively. In about 1985, all of Rose's shares in the corporation were tendered back to the corporation. Since then, Rondina and Davis have held seventy-five percent and twenty-five percent of the outstanding shares of the corporation, respectively.

agreement. Paragraph 2(a) of that agreement provides:

Both Rondina and Davis shall be employed by the Corporation for a period of two years commencing as of October 1, 1981 in the form of the Agreements annexed. Except as hereinafter provided, their said employment shall be automatically renewed for successive two year periods. Their salaries and other compensation shall be equal and shall continue at the same rate unless changed by mutual agreement.

Paragraph 2(b) of the agreement provides:

Davis shall devote her full time and efforts to her employment as President.... She is to be responsible for the overall management of the business of the Corporation. Her functions shall include, but shall not be limited to, the recruitment, training, supervision and replacement of managers and of saleswomen, the preparation of training and of operations manuals and of all other documents and forms, advertising and sales promotion....

Paragraph 3 of the shareholders agreement specifies that an eighty-nine percent shareholder vote is required for:

(a) Authorizing or consenting to any transaction not in the ordinary course of business, including but not limited to a major purchase of property;

*   *   *   *   *   *

(e) Making any change in the employment contract or the terms of employment of Rondina or Davis or terminating or not renewing Davis or Rondina's employment contract for any two-year period;

*   *   *   *   *   *

(i) The election or removal of officers or directors and establishing the number of directors.

Article XI, section 2 of the corporation's by-laws also requires an eighty-nine percent shareholder vote and unanimous director approval for the same matters.

The by-laws were amended on February 16, 1984, to provide for two directors. Rondina and Davis have always held those positions. The amendment also provided that in the event of a tie vote, Rondina may designate a third director to vote on items that do not require unanimous director approval.[4] In addition, article IV, section 3 of the by-laws also provides that:

Any officer may be removed, either with or without cause, and a successor elected by a unanimous vote of the Board of Directors at any time.

The original by-laws provided that the President of the corporation shall be Chief Executive Officer of the corporation. However, in a resolution dated February 16, 1984, adopted unanimously by the Board of Directors, William Rondina was elected CEO of the corporation. Some time in 1989 Davis became Chief Operating Officer of the Corporation. She has retained her position as President throughout the corporation's existence.

Davis' employment agreement, a letter to her from The Carlisle Collection, Ltd. dated October 1, 1981, provides, in part:

This letter constitutes your employment contract as President of The Carlisle Collection, Ltd. It is supplemental to our Stockholders Agreement of even date herewith. That agreement spells out the duties of your employment, the circumstances under which it is to be renewed from time to time and agreements relevant to activities competitive with The Carlisle Collection, Ltd.

*   *   *   *   *   *

You are required at your own expense to have an office in Michigan.... The company will pay for a secretary...

The shareholders agreement also provides that in the event of a planned dissolution of the corporation, Davis has the option to purchase Rondina's shares at book value. Shareholders Agreement ¶¶ 8–9. Further, if Davis' employment is terminat-

---

**4.** This amendment, while changing the number of directors, did not alter the balance of power in the corporation from that contained in the original by-laws. The amendment merely ratified the existing state of affairs. The company has never had more than two directors, and Rondina and Davis have always held those positions.

ed, or if she becomes disabled or retires, the corporation shall purchase her shares for book value. Shareholders Agreement ¶¶ 6, 9. In the event of Rondina's termination of employment, disability, retirement or death, the corporation shall be dissolved, subject to Davis' option to purchase in the event of a dissolution. Shareholders Agreement ¶¶ 7–8.

## II. THE GROWTH OF THE CORPORATION

The company has been very successful. It began its first season, Fall 1982, with a sales force of ninety consultants. By the fall of 1989, the company had approximately nine hundred consultants. Annual net sales have risen from approximately two million dollars to approximately twenty-eight million dollars. The company has been profitable in each year of its operation.

Originally Davis worked in Michigan while Rondina designed and manufactured the clothing in New York. In 1984, as the company grew larger and Davis' situation made it possible, she moved her office from Michigan to New York, where it remains.

Rondina and Davis are the top management at the company. Below them are a number of vice presidents. The company also has regional managers, district managers and sales consultants. Among the upper management are Howard Unker, who is the company's financial officer, John Hoffee, who heads the company's operations, Sheila Holderness, who was responsible for training and development, Pluma Bridges, who was responsible for recruitment, and Judith Bickel, who was responsible for St. A, a division of Connaught. The company also employs outside consultants, including accountants and lawyers.

It was the regular practice of Rondina and Davis to meet with Unker once a week to discuss the company's finances. Rondina and Davis together met with the company's outside advisors several times a year. In addition, the company held periodic meetings of regional managers and district managers. Before the trouble started, Davis and Rondina saw each other several times every day. Even when one was in New York and the other in Michigan, they spoke on the telephone at least four times a day and frequently visited each other. Both met all regional managers before they were hired, although only Davis was involved in the application process.

Materials for the manufacture of clothing must be ordered up to a year in advance of the sale of the clothing. Thus, Connaught and Rondina, Inc. rely heavily on projections of future sales to determine the quantity of materials to be purchased. In addition, the company routinely borrows money to fund the acquisition of materials and repays these bank loans from the proceeds of the sales of the finished goods. The bank relies heavily on and monitors Connaught's projections. Therefore, meetings with the bank were fairly frequent and were attended by both Rondina and Davis. Davis has guaranteed the bank line of credit to Connaught both personally and as an officer of the corporation. She also has guaranteed the bank line of credit to Rondina, Inc. as an officer of Connaught. Only Rondina has check signing authority for Connaught.

During 1989, the company began to set up a National Recruiting Office (the "NRO") under the direction of Bridges. The office was to handle the recruiting of sales consultants. It represented a new development in Connaught's method of recruiting. The NRO became operational in the beginning of 1990. It cost about one million dollars to establish.

After discussing the possibility for several years, in 1989 the company decided to launch a new division, St. A. St. A. was planned as a new line of clothing which would be marketed in the same way but would be targeted at a different group of women. In anticipation of the new line, Carlisle changed its corporate name to Connaught. "Carlisle" and "St. A" became the names of the two divisions of Connaught. Both Davis and Rondina recognized that starting a new line would require substantial capital. They planned to use the profits from Carlisle to fund the start-up of St. A. They did not intend, however, that Car-

lisle would incur an operating loss as a result of this new line.

In June of 1989, a meeting was held to finalize the plans for St. A. In attendance were Davis, Rondina, Bickel, who was responsible for St A., Unker, and a number of other employees of Connaught. The number of consultants originally projected for St. A.'s first season was between 120 and 140. At the meeting, Rondina informed Davis and Bickel that it would not be economically feasible for Rondina, Inc. to manufacture a line for so few consultants. He told them that they would either have to increase the planned number of consultants to 200, or not go ahead with the line. At that time, Davis told Rondina that 200 consultants would be possible. They decided to proceed with the line and targeted Spring 1990 for the first collection.

Rondina testified that during the fall of 1989 he became concerned that St. A. would not meet its projected number of consultants. He foresaw that, as a result, he would not be able to sell a substantial portion of the inventory already manufactured. He testified that he was very concerned by January of 1990 as he saw the shortfall of consultants and the consequent losses of the St. A. division growing larger. His fear was that not only would the St. A. losses eat up most of the Carlisle profits, but that the losses would be so large that they would drive the entire company into a loss position. He noted that he was also nervous about the number of Carlisle consultants. Rondina testified that he repeatedly attempted to talk to Davis about this problem, but that she would not recognize it as a problem or speak with him about it. In February of 1990, St. A's Spring line opened. At that time there were 117 showings scheduled. The number projected had been 189.

Davis testified that she knew that the number of consultants was below the projected number and that she had always been willing to discuss the situation with Rondina. She also testified that, based on her experience with the Carlisle startup, many consultants and shows were added after the season began and people became interested in the clothing after seeing it. Further, she noted that during the two weeks of the fall season before St. A. was aborted, the consultants were selling at a higher than projected rate. Therefore, since the dollar figure for total sales is equal to the number of consultants multiplied by sales per consultant, a lower than projected consultant number could be offset by a higher than projected sales rate per consultant. She noted that projections were educated guesses and that she made the St. A. projections based on her knowledge of the business and to the best of her abilities. She also testified that the last set of projections discussed with her showed Connaught having a $700,000 profit as a worst case scenario.

## III. DISSENSION AT THE CORPORATION

Both parties agree that originally they discussed almost all corporate matters before any decisions were made. However, relations between Davis and Rondina started to deteriorate over a year ago. Further, according to both, during the course of the events described below, their relationship continued to deteriorate to the point where communication stopped.

Sometime in the fall of 1989, the two met at Davis' apartment for dinner to discuss the deteriorating situation. According to Davis, during that meeting she told Rondina that she was in charge of the corporation, to which he responded that he wanted to get the shareholders agreement interpreted. Davis testified that at the end of the meeting, Rondina stated, "You know, I can destroy Carlisle by raising the gross profits in Rondina, Inc." Rondina testified that the meeting did occur, that he did dispute that Davis was in charge of the company, but that he never threatened to destroy the company.

The dinner meeting was followed by a meeting between the two of them and their respective attorneys. According to Davis, at that meeting, her attorney advised Rondina that there were certain things he could not do under the shareholders agreement.

Davis noted that Rondina's response to this was to state that if that was true, he "wanted out." Rondina agrees that the meeting took place, but denies stating that he "wanted out" of the shareholders agreement. Some time after that meeting, Davis, through her attorney, wrote to Rondina and offered to buy him out. He did not respond to the letter until after this suit was filed.

On January 12, 1990, Rondina scheduled a meeting with Howard Unker and two of Connaught's outside financial consultants to discuss the shortfall in the number of St. A. consultants. Davis was not invited to the meeting. At Davis' request after she learned that the meeting had occurred, Unker gave her the information that was discussed at the meeting. At that time the projection for 1990 was for a profit of approximately $700,000.[5]

On February 7, 1990, a meeting attended by Unker, Rondina, one of the company's accountants and Rondina's counsel was held at the office of Rondina's counsel. Again, Davis was not invited. At that time, the projection was revised to show a loss for the year. Unker testified that although he generally reported to both Rondina and Davis, he did not tell Davis about that meeting or the new projections because he wanted to avoid getting into the middle of a dispute between the two owners. There is no evidence that Davis was informed about this revised projection before this suit began.

Davis had scheduled a regional sales managers meeting for Saturday, February 24, 1990, in Florida. On February 23, Davis received a call from Bickel, the vice president in charge of the meeting, informing her that Bickel had just received a call from Rondina ordering her to cancel the meeting. Davis told Bickel to go ahead with the meeting as scheduled. She then went to Rondina's office and told him that he could not cancel her meetings and that it showed bad judgment to air their problems before the sales force. Later that day, she

wrote him a memorandum on the same subject. After Davis left the office for the day, Rondina called each regional sales manager and told her not to attend the meeting. On February 24, Davis had a conference call with all the regional managers. According to her, she held the call in order to explain things to them so that they would continue to work and to tell them not to share the dispute with the sales force. According to Rondina, she vilified him during the call and threatened to fire anyone who mentioned him. Rondina testified that he canceled the meeting because he did not approve of the agenda which he had not received until just before the meeting was to occur.

## IV. SPECIAL BOARD MEETING

The following Monday, February 26, Davis received notice of a special Board meeting scheduled for February 28. The corporation had never before had a Board meeting. Both Rondina and Davis brought legal counsel to the meeting and a court reporter recorded the entire meeting.

At the Board meeting, a number of resolutions were adopted by a two to one vote. At the beginning of the meeting, Rondina designated Grace Rose as the third director in case of a tie. Rondina voted for each resolution. Davis voted against each resolution. Rose then cast the deciding vote for each resolution. No shareholder vote was taken on any of these resolutions.

The first resolution was to abort St. A. As part of the resolution, Davis was "specifically directed by the Board that she is to work under the direct supervision of the CEO, William Rondina, and take express directions from him or his designees in respect of all of the above matters."

The second resolution was to close the NRO and restructure recruiting. Part of the restructuring involved firing Pluma Bridges, Vice President in charge of recruiting, as well as the support staff and the field organization of the NRO. Again,

---

**5.** There is a dispute about whether this number represents the worst case scenario or the actual projected profit. However, there is no dispute that this was the projection discussed at the January 12 meeting and soon thereafter relayed to Davis.

Davis was directed to work under the direct supervision of Rondina in this matter.

The third resolution was to restructure training and development. The restructuring included firing Sheila Holderness, Secretary of the corporation and Vice President in charge of training and development. Again, Davis was specifically directed to work under the direct supervision of Rondina in this matter.

The fourth resolution was to terminate Limited Editions for Her, the division of the corporation that disposed of overstock, and to implement a new system of dealing with overages. Again, Davis was specifically directed to work under the direct supervision of Rondina in this matter.

The fifth resolution was to cut costs in accordance with a schedule produced by Rondina. Part of the savings schedule included the firing of Davis' secretary. Rondina testified at trial that he fired her because she was not friendly to him.

The sixth resolution was to reduce the salaries of Rondina and Davis to $125,000 each.

The seventh resolution was to order Davis to have "no written communication to the staff and/or sales force without prior review and written approval of William Rondina or his designees. Policy changes in the company shall not be made without similar written approval by me or my designees." Again, Davis was specifically directed to work under Rondina's supervision.

The eighth resolution was to authorize the company and Rondina to commence court proceedings and take other appropriate actions with respect to Davis and her wrongful acts. This resolution was passed following a long and inflammatory tirade by Rondina about Davis' allegedly wrongful acts.

Before the votes, exhibits were distributed which allegedly supported Rondina's position. Davis was not given the exhibits before the meeting and there is no evidence that she had access to the figures in the exhibits before the meeting. Unker testified that he was aware of Rondina's plans before the Board meeting but that he did not inform Davis of them. Unker, who prepared the exhibits, also testified that one could not use the exhibits to reach an informed conclusion about the resolutions because the figures supporting the conclusions contained in them were not distributed at the Board meeting. Also, Unker testified that the cost reduction schedule distributed at the meeting did not reflect entirely accurately what he understood to be the cost reduction plans.

At the Board meeting, Rondina also announced that he had raised the price Rondina, Inc. charged to Connaught from twenty-eight percent profit to thirty-five percent profit for Rondina, Inc.

Rose, the third director who voted for all these proposals, testified at her deposition that aside from meeting with Rondina and then briefly with Rondina's attorney, she did not prepare for the Board meeting. At their conference, Rondina informed her that Connaught was in financial trouble and told her in broad language what he wanted to do. No specifics were discussed and no financial documents or material were examined. She did not review either the shareholders agreement or the by-laws before the Board meeting. She also testified that she understood that she, as a part owner of Rondina, Inc., would gain financially if the price Connaught paid for goods from Rondina, Inc. was increased.

## V. AFTER THE BOARD MEETING

After the Board meeting, Rondina established an Office of Sales and Recruiting consisting of himself, Unker and Hoffee to take over the functions of the NRO and the training and development organization. Davis was not made part of this office. The formation of this office was announced in an article written by Rondina in the in-house newsletter. In the article, he listed the three members of the office and explained how the office would work. Davis was not mentioned. Unker testified that Rondina asked the Office of Sales and Recruiting to act independently of Davis. He further testified that no one at the office would take direction from Davis

without Rondina's approval. He also noted that the office receives weekly reports from the regional managers and that he never asked anyone to send Davis a copy of these reports and does not know if she has received any. Unker stated that he does not report to Davis and, to his knowledge, no one from the office reports to her. Unker also testified that he is empowered to make certain decisions for the office without consulting Rondina.

On the Monday following the Board meeting, Rondina held a meeting of all of the regional sales managers at the New York office. Davis was not invited to the meeting. Rondina posted guards on her floor and on Holderness' floor to make sure that the meeting was not disturbed. Rondina stated that any of those fired who attempted to enter the premises would be treated as trespassers. Holderness attempted to enter her office and was excluded by a guard. Further, the regional managers, who had originally reported to Davis through the vice presidents, were instructed to report directly to Rondina. Some time after the Board meeting, Davis tried to schedule a conference call with the regional sales managers. Rondina forbade them to talk to her on such a call.

Other changes occurred as well. Rondina wrote to the sales force discussing his new plans for advertising. The weekly meetings attended by Rondina, Davis and Unker to discuss financial matters were cancelled.

Based on my examination of all the evidence and my observation of the demeanor of Davis and Rondina both on direct examination and on cross-examination, I find Davis to be a very credible witness. To the extent that Rondina contradicted Davis' version of the facts, I reject his testimony.

## DISCUSSION

### I. PRELIMINARY INJUNCTION STANDARD

A movant is entitled to a preliminary injunction if she shows that she will suffer irreparable injury in the absence of the requested relief, and either (1) a likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation, and a balance of hardships tipping decidedly in the movant's favor. *Le Sportsac, Inc. v. K–Mart Corp.*, 754 F.2d 71, 74 (2d Cir. 1985).

### II. LIKELIHOOD OF SUCCESS

Davis claims that Rondina's conduct violated the shareholders agreement. Rondina defends on two grounds. First, he takes the position that his actions did not violate the agreement. Second, he contends that even if his conduct did violate the agreement, it was excused because, as a director and the majority shareholder, he was entitled to take the actions he did to rescue the corporation from Davis.

■ The parties agree that shareholders agreements like the one at issue here are generally enforceable. Under New York law, shareholders agreements are to be interpreted according to the law of the state of incorporation. *Zion v. Kurtz*, 50 N.Y.2d 92, 100, 428 N.Y.S.2d 199, 405 N.E.2d 681 (1980). Section 350 of the Delaware General Corporation Law provides:

> A written agreement among the stockholders of a close corporation holding a majority of the outstanding stock entitled to vote ... is not invalid, as between the parties to the agreement, on the ground that it so relates to the conduct of the business and affairs of the corporation as to restrict or interfere with the discretion or powers of the board of directors....

Del.Code Ann. tit. 8, § 350 (1974). This section is only applicable to a close corporation which elects to be treated as such under section 344 of the Delaware General Corporation Law. Del.Code Ann. tit. 8, § 341 (1953); *Chapin v. Benwood Foundation, Inc.*, 402 A.2d 1205 (Del.Ch.1979), *aff'd* 415 A.2d 1068 (Del.Supr.1980). However, in *Zion v. Kurtz*, 50 N.Y.2d 92, 428 N.Y.S.2d 199, 405 N.E.2d 681 (1980), the New York Court of Appeals, applying Delaware law, held that where, as here, the corporation would be eligible for close corporation status, there are no intervening

rights of third parties, nothing in the shareholders agreement is forbidden by statute and all of the shareholders have subscribed to the agreement, section 350 governs even if the corporation has not formally elected close corporation treatment under section 344.

A. *Management*

■ The shareholders agreement clearly states that Davis is President of the corporation and "is to be responsible for the overall management of the business of the Corporation." It then goes on to specify that,

> Her functions shall include, but shall not be limited to, the recruitment, training, supervision and replacement of managers and of saleswomen, the preparation of training and of operations manuals and of all other documents and forms, advertising and sales promotion....

Shareholders Agreement ¶ 2(b). In addition, paragraph 3 of the shareholders agreement and article XI, section 2 of the by-laws provide that any change in Davis' employment contract or the terms of her employment can only be made with an eighty-nine percent shareholder vote and a unanimous director vote. Davis claims that Rondina's conduct breached these provisions. Rondina responds that he did not breach them and that Davis is not entitled to any management authority under these provisions.

Shareholders agreements like the one at issue are classic vehicles for assuring minority shareholders in close corporations a voice in management. *See generally* 1 O'Neal and Thompson, *O'Neal's Close Corp.*, Chapters 5–6 (3d ed. 1987). Further, the agreement at issue specifically discusses Davis' responsibilities. Finally, Davis testified very credibly that this shareholders agreement was executed in order to secure her a voice in the management of the corporation. When questioned about why he and Davis entered into the agreement and what was meant by the provisions at issue here, Rondina was unable to specify the purpose other than that it was done for the benefit of both shareholders. Clearly, the seventy-five percent

shareholder of a close corporation does not need a shareholders agreement to protect his position. In light of the evidence presented at the hearing, I find that Davis is likely to be successful in demonstrating that the shareholders agreement prohibits Rondina from excluding her from a role in the management of Connaught.

Rondina also argues that even if Davis has some management authority pursuant to the agreement, she waived her right to exercise that authority by not objecting to the actual practices of the corporation. There was much dispute at the hearing over whether Davis or Rondina had final authority for the management decisions of the corporation. According to Davis and her witnesses, she was in charge of the day-to-day management of the corporation, she and Rondina shared the financial responsibilities, and Rondina was in charge of the design and production of the clothing carried out by Rondina, Inc. According to Rondina and his witnesses, he had final authority for all matters. What was clear from all the testimony was that until the relatively recent breakdown of communications, Davis and Rondina discussed issues of management and action was taken by consensus. Since the two essentially behaved like partners, the issue of who really had final authority never specifically arose until this lawsuit. In addition, putting aside the issue of final authority, I find that Davis was in charge of the day-to-day management of the corporation. Her description of how the company functioned was much more credible than Rondina's. Therefore, I find that Rondina's purported waiver defense does not undercut Davis' likelihood of success on the merits.

Finally, I am persuaded that Davis is likely to demonstrate at trial that Rondina breached the shareholders agreement. She offered uncontroverted evidence that he held financial meetings behind her back, cancelled meetings she scheduled, restructured the corporation over her objection, directed her repeatedly to follow his orders, forbade her from contacting the sales force, directed the people who used to report to her to report to him instead and

eventually not to even speak with her, and even fired her secretary. He restructured the company so that no one reported to her, listened to her, or involved her in any decisions. Davis is likely to succeed on the merits because the evidence demonstrates that Rondina essentially cut her out of the management of the company entirely, thereby breaching the shareholders agreement which was designed to protect her voice in management.

■ Both the shareholders agreement and the by-laws of the corporation provide that the removal of officers can only be done with unanimous director approval and eighty-nine percent shareholder support. Shareholders Agreement, ¶ 3(i); By–Laws, Article XI, § 2. At the Board meeting, Rondina unilaterally fired Bridges and Holderness, two corporate officers. In addition, since the Board meeting, other officers have been fired or demoted by Rondina. This action is itself a breach of the shareholders agreement. It is also additional evidence of Rondina's attempt to strip any control of the corporation from Davis. He has removed all the top people who were loyal to her from the company or at least from positions of authority and has replaced them with personnel instructed not to report to Davis. Since Davis kept in touch with the sales force primarily through the removed vice presidents, the effect of Rondina's elimination of these vice presidents has been to sever Davis' ties with the sales force.

■ Rondina also argues that, even if he breached the shareholders agreement, that breach is excused because as a fiduciary and owner of the corporation, he did what was necessary to save the company from Davis' gross mismanagement and misfeasance. He seems to allege that Davis' conduct in agreeing to the projection of 200 St. A. consultants in June of 1989, and in either not meeting that projection by February 1990 or not acting to rectify the situation was egregious. He also seems to contend that her voting against his proposals at the Board meeting was egregious. He points to nothing else she did that was wrong, except perhaps to complain about him to the regional managers.

In support of the position that he was entitled to take the action he did, Mr. Rondina relies on *Fells v. Katz*, 256 N.Y. 67, 175 N.E. 516 (1931), a New York case in which the Court of Appeals held that it would not enforce an employment contract contained in a shareholders agreement in light of the employee/shareholder's disloyalty in starting a competing business, and on *Kelly's Logan House, Inc. v. Ogden*, No. 7906 (Del.Ch. January 18, 1985), in which the Delaware Chancery Court suggests that misuse of corporate funds to start a competing business by one shareholder may excuse the other shareholder's breach of a shareholders agreement by ousting the non-loyal shareholder. In both of these cases, the shareholder who was ousted in spite of the shareholders agreement had engaged in self-dealing and had breached his duty of loyalty to the corporation by attempting to start a competing business. There is no allegation or evidence in this case that Davis engaged in self-dealing or breached her duty of loyalty, or any other duty, to the corporation. The issues raised by Rondina are nothing more than issues of business judgment, not evidence of misfeasance. In fact, Rondina deliberately withheld from Davis information she needed to make fully informed decisions on the resolutions proposed at the Board meeting. Therefore, the excuse relied upon in both *Fells* and *Kelly's Logan House* is not available to Rondina on the facts of this case.

### B. *Salary*

■ There is no dispute that Rondina lowered his and Davis' salaries at the Board meeting without Davis' consent and without a shareholder vote. Paragraph 2(a) of the shareholders agreement provides, in part, that the salaries and other compensation of Davis and Rondina "shall be equal and shall continue at the same rate unless changed by mutual agreement." Paragraph 3 of the shareholders agreement and article XI, section 2(e) of the by-laws provide that an eighty-nine percent shareholder vote and unanimous di-

rector approval is required to "mak[e] any change in the employment contract or the terms of employment of Rondina or Davis...."

Although the natural reading of these provisions is that the salaries must be equal and that mutual consent is required to change them, Rondina argues that these provisions only require that the salaries must be equal. In support of his position, Rondina notes that it is apparent in both the shareholders agreement and the by-laws that the latter provision originally read "mak[e] any change in the employment contract or the terms of employment of Rondina *and* Davis...." (emphasis added), and that the "and" was stricken and replaced with "or" before execution. He argues that the intent of the parties in substituting "or" for "and" was to make it possible for the salaries to be unilaterally changed, as long as they remained equal. Despite defense counsel's representations that evidence of this intention would be provided, no such evidence has ever been presented. At the hearing, Rondina was unable to offer any explanation for the word change. Therefore, I find no reason to depart from the natural reading of these provisions and since Rondina unilaterally lowered the salaries, I find that Davis is likely to succeed in her claim that Rondina breached the shareholders agreement by doing so.

## III. IRREPARABLE HARM

■ Having determined that Davis is likely to succeed on the merits of her action, I turn to the first prong of the preliminary injunction test, irreparable harm.

The shareholders agreement between Davis and Rondina guarantees Davis a voice in the management of Connaught, a company which she has devoted almost ten years to building and which she has shepherded from start up to success. Money damages will not compensate her for loss of the opportunity to continue to manage the company which she has helped to build and for which she has guaranteed substantial loans. *See Street v. Vitti,* 685 F.Supp. 379, 384 (S.D.N.Y.1988) (in which the court held that monetary compensation would be inadequate to compensate plaintiffs for a violation of a shareholders agreement which destroyed their voice in management).

It is instructive that the Court of Chancery of Delaware found irreparable harm in very similar circumstances in *Di Nardo v. Renzi,* No. 8977, 1987 WL 10014 (Del.Ch. April 24, 1987). In that case, Renzi, president of the company and holder of fifty percent of the company's shares, fired Di Nardo, the other fifty percent shareholder. He also stopped paying Di Nardo's salary, changed the locks on the company's doors, and invoked a provision in the shareholders agreement to effect the forced sale of Di Nardo's shares. From the start of the company, the two had been the only directors of the company and Di Nardo had held a variety of corporate offices. The actions seemed to be in violation of both a resolution passed by the Board and of the shareholders agreement. It was clear that relations between the two had deteriorated because of policy disputes. It was also clear that Di Nardo had been involved in the management of the corporation, despite the fact that Renzi had the title of "President." Further, the court noted that Di Nardo had guaranteed loans to the company. The court also noted that while Di Nardo's return would not be comfortable, there was no evidence that either party would allow their dispute to destroy the company. On these facts, the Delaware court found that Di Nardo would suffer irreparable harm from defendant's actions and enjoined the defendant from interfering with plaintiff's right to participate in the company and receive a salary.[6]

---

6. Rondina responds by citing *Kelly's Logan House v. Odgen,* No. 7906 (Del.Ch. January 18, 1985), in which the Delaware Chancery Court refused to grant a preliminary injunction to enforce a shareholders agreement. However, the decision in *Kelly's Logan House* is inapposite because it rests primarily on the court's finding that the ousted shareholder was not likely to succeed on the merits of his claim because he breached both his duty of loyalty to the corporation and a specific non-competition clause in the agreement.

In his opposition to the grant of a preliminary injunction, Rondina argues strenuously that granting such an injunction would be pointless because he and Davis cannot work together. Whether that is true remains to be seen. Although communication had been strained for some time, the parties managed to run a business together until Rondina attempted to force Davis out. In addition, both parties demonstrated a strong interest in the success of Connaught at the hearing. Further, the shareholders agreement contains very specific provisions addressing what should be done if either party wishes to leave the company or if the company dissolves. If the parties cannot work together, appropriate action should be taken in accordance with the shareholders agreement, the company's by-laws and the relevant corporation laws. Rondina cannot avoid following the procedures for dissolution or receivership contained in his agreement and the law by forcing out Davis wrongfully and then fighting her reinstatement on the ground that he cannot get along with her.

## CONCLUSION

The above constitute my findings in accordance with Rule 65(d) of the Federal Rules of Civil Procedure.

Pending the final judgment in this case, William Rondina, his agents, servants, employees, and attorneys, and those persons in active concert or participation with them who receive actual notice of this order by personal service or otherwise are hereby prohibited and enjoined from:

(1) preventing or interfering in any way with Caroline Davis' performance of her duties as President and Chief Operating Officer of The Connaught Group, Ltd. ("Connaught") in the same manner and to the same extent as prior to February 28, 1990, including but not limited to full access to all records and information of Connaught, full access to all personnel of Connaught and especially all sales and promotion employees who shall report to Davis as they did prior to February 28, 1990, and participation in all meetings and decisions in which Davis participated prior to February 28, 1990;

(2) preventing or interfering in any way with the payment to Davis of her salary in the same amount and in the same manner as such payment was made prior to February 28, 1990;

(3) preventing or interfering in any way with the employment by Davis of the services of a secretary of her choice;

(4) removing any officer of Connaught from an office held immediately prior to February 28, 1990 without unanimous director approval and eighty-nine percent shareholder approval;

(5) making any change in the employment contract or the terms of employment of Davis without unanimous director approval and eighty-nine percent shareholder approval.

SO ORDERED.