Eccles v Shamrock Capital Advisors, LLC (2024 NY Slip Op 02841)

Eccles v Shamrock Capital Advisors, LLC

2024 NY Slip Op 02841 [42 NY3d 321]

May 23, 2024

Singas, J.

Court of Appeals

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

As corrected through Wednesday, November 27, 2024

[*1]

Nigel John Eccles et al., Appellants,
v
Shamrock Capital Advisors, LLC, et al., Respondents.

Argued April 16, 2024; decided May 23, 2024

Eccles v Shamrock Capital Advisors, LLC, 209 AD3d 486, reversed.

{**42 NY3d at 328} OPINION OF THE COURT

Singas, J.

This case requires us to resolve questions that frequently confront our courts in the course of international business disputes. Consistent with New York's established interest analysis approach to choice-of-law issues, we hold that, with rare exception, the substantive law of the place of incorporation applies to disputes involving the internal affairs of a corporation. Once a court determines that another jurisdiction's law governs, it has significant flexibility and discretion in deciding whether to take notice of that foreign law and apply it to the case at hand. In the present case, the Appellate Division correctly concluded that Scots law applies to plaintiffs' claims and appropriately took judicial notice of its content in resolving defendants' motions to dismiss. We conclude, however, that plaintiffs have sufficiently pleaded causes of action for breach of fiduciary duty under Scots law. Accordingly, we reverse the Appellate Division order.
I.[FN1]
This dispute centers on events surrounding a 2018 merger between FanDuel Ltd. (FanDuel) and the United States assets of nonparty Paddy Power Betfair plc (Paddy Power). In 2007, plaintiffs Nigel Eccles, Lesley Eccles, Thomas Griffiths, Robat Jones, and Chris Stafford founded FanDuel's predecessor, Hubdub Ltd. (Hubdub), in Scotland. Though Hubdub originally allowed users to place bets on current events, the business's focus soon turned to fantasy sports, eventually entering the daily fantasy sports industry through FanDuel. Expanding into the American fantasy sports market in 2009, FanDuel grew rapidly and established its headquarters in New York in 2011.
By 2015, FanDuel's principal competitor was DraftKings, and the two companies were engaged in an expensive marketing{**42 NY3d at 329} war. The following year, FanDuel and DraftKings agreed to a "merger of equals," in which the two companies would combine, and each company's shareholders would receive half of the equity of the new company. At that time, pursuant to its Articles of Association (Articles), FanDuel had multiple share classes and a "waterfall provision" governing the distribution of the merger proceeds. For purposes of that merger deal, FanDuel's negotiating committee settled on a fully diluted equity valuation of $1.2 billion. A majority of FanDuel shareholders agreed to this valuation, but the merger was ultimately abandoned due to antitrust and other regulatory challenges.
On the heels of the failed merger, FanDuel's shareholders sought to simplify the company's ownership structure. FanDuel's board—including some plaintiffs—and its shareholders approved a set of amendments to the Articles. The reforms collapsed the classes of stock into two categories: "A Preference Shares" (preferred shares) and "New Ordinary Shares" (common shares). As relevant here, Article 83 of the Articles maintained the waterfall provision, which provided that in the event of the winding down of the company, preferred shareholders were entitled to be compensated first for the value of their stock. Article 83 limited the extent of the preferred shareholders' remuneration to the original subscription price of their shares. During the events at issue, the total subscription price of the preferred shares amounted to approximately $559 million. Any "aggregate consideration" that the company received above this amount would be distributed to the common shareholders on a pro rata basis.
Defendants Shamrock Capital Advisors, LLC, Shamrock Capital Growth Fund III, LP, Shamrock FanDuel Co-Invest LLC, and Shamrock FanDuel Co-Invest II, LP (collectively, Shamrock), and KKR & Co., Inc., Fan Investor Limited, and Fan Investors L.P. (collectively, KKR), held respectively 15% and 21% of the preferred shares. They were also [*2]designated "dragging shareholders" by Article 78 of the Articles. As dragging shareholders, Shamrock and KKR held the power to compel the other FanDuel shareholders to submit to a proposed merger offer. The Articles mandated that any such offer be based on "bona fide arm's length terms."
In 2018, the board of directors began to explore financing options for the company with the assistance of Moelis & Company (Moelis). Moelis purportedly presented several options to the board, including a potential merger with Paddy Power, a British{**42 NY3d at 330} sports betting company. That presentation did not assign any potential value to FanDuel or the merged entity, but provided an appendix projecting that, if sports betting was legalized in the United States, FanDuel would earn more than $1.1 billion in annual revenue within five years. FanDuel thereafter entered into merger negotiations with Paddy Power. The negotiations unfolded as the United States Supreme Court considered Murphy v National Collegiate Athletic Assn. (584 US 453 [2018]), a case that had the potential impact of allowing states to legalize sports gambling. On April 28, 2018, FanDuel and Paddy Power agreed to a nonbinding set of terms for a merger; the two companies would be compensated for their contributions of capital to the merger with stock in what would become the new company, defendant PandaCo, Inc. (PandaCo).[FN2] Under the terms, the FanDuel shareholders would be entitled to an approximate 40% share in the new company compared to Paddy Power's approximate 60% share.[FN3] Notably, the draft term sheet specified that for the purposes of the merger the values of the two companies would remain the same regardless of the outcome of Murphy. It noted that the "waterfall of, and allocation of proceeds among, Fan[D]uel stockholders remain[ed] subject to discussion."
On May 14, 2018, the Supreme Court held that Congress could not preclude states from legalizing sports gambling (see Murphy, 584 US 483). On May 22, FanDuel's directors, including defendants Michael LaSalle, Edward Oberwager, Andrew Cleland, Matthew King, Carl Vogel, and David Nathanson (collectively, the director defendants),[FN4] and Andrin Bachmann held a board meeting in New York. They unanimously voted to{**42 NY3d at 331} proceed with the [*3]merger in accordance with the nonbinding terms, resolving that the consideration FanDuel would receive was to be distributed to the shareholders in accordance with Article 83. At the meeting, the chairperson reminded the board of its statutory duties under the UK Companies Act 2006 (Companies Act) to promote the welfare of the corporation. The director defendants voted to proceed with the merger, and resolved that the consideration—i.e., the PandaCo shares—would be distributed through the waterfall provision. It further resolved that
"the value of the consideration to be run through such waterfall would be based on the implied enterprise value of both [FanDuel] and the assets [Paddy Power] was contributing to [PandaCo] as had initially been agreed in the Term Sheet, net of certain mutually agreed deductions for the purposes of establishing an equity value of each such contribution, which, in the aggregate, resulted in the [PandaCo] shares to be run through such waterfall being considered worth an aggregate amount equal to $465.5 million."
The board did not seek an independent valuation of that consideration. Bachmann abstained from the vote concerning the valuation of the proceeds. The next day, FanDuel, through its Chief Executive Officer (CEO) King, signed a "Contribution Agreement" with Paddy Power and PandaCo outlining the terms of the merger and setting a "Signing Date Share Price" for a single share of PandaCo.
On June 30, FanDuel received both a formal offer to acquire all of its shares in exchange for approximately 40% of PandaCo's shares, and a notice that KKR and Shamrock were exercising their drag-along rights and accepting the offer on behalf of all FanDuel shareholders (Drag Along Notice).[FN5] Thus, no shareholder vote was held on the merger. Plaintiffs first received notice of the merger on July 3, pursuant to an email from FanDuel's Chief Legal Officer. The email contained a summary{**42 NY3d at 332} of the merger, the Drag Along Notice, and the offer letter. Plaintiffs never received the Contribution Agreement.
The merger closed on July 11, 2018. Because the merger proceeds were valued at $465.5 million—below the total $559 million subscription price of the preferred shares—when the preferred shareholders were compensated first in accordance with Article 83, they received the entirety of FanDuel's approximate 40% share in PandaCo. FanDuel's common shareholders received nothing, and FanDuel was effectively dissolved. Pursuant to an agreement whereby acceptance of the PandaCo offer would grant defendants Fastball Holdings LLC, Fastball Parent 1 Inc., and Fastball Parent 2 Inc. (Fastball Holdings) a call option for the FanDuel shareholder's PandaCo shares, Fastball Holdings immediately exercised its call option, and these shares were subsequently conveyed. Fastball Holdings was controlled by three of the defendant directors along with KKR and Shamrock and owned entirely by FanDuel's former preferred shareholders.
II.
After procedural history in Scotland not directly relevant here, plaintiffs, a group of over 100 common shareholders and founding members of FanDuel who collectively owned around 10% of its common shares,[FN6] commenced the [*4]instant action pleading causes of action under New York law. Plaintiffs alleged that defendants engaged in a scheme designed to ensure that FanDuel's preferred shareholders exclusively would benefit from the merger with Paddy Power. To effectuate the scheme, plaintiffs asserted, defendants deliberately undervalued FanDuel's assets during the merger negotiations to be equivalent to the value of the preferred shares, when in reality FanDuel was worth significantly more in light of the outcome of Murphy. The first and second causes of action alleged that the director defendants "owed fiduciary duties" to FanDuel's shareholders, and that they breached these duties because they were financially interested in the merger and acted in their own self-interest, failing to treat the shareholders with entire fairness. Specifically, plaintiffs alleged that the director defendants breached these duties by failing to obtain a fair{**42 NY3d at 333} valuation of the PandaCo shares and impermissibly imposing their own depressed valuation in order to enrich the preferred shareholders at the expense of the common shareholders.[FN7] The third cause of action asserted a claim for breach of fiduciary duty against KKR and Shamrock. The fourth cause of action asserted a claim of aiding and abetting a breach of fiduciary duty against KKR, Shamrock, the FanDuel Group, Fastball Holdings, and PandaCo for "substantially assisting" the director defendants in their breaches of fiduciary duties. Lastly, the fifth cause of action asserted a claim of unjust enrichment against KKR, Shamrock, and Fastball Holdings.
The director defendants, FanDuel Group, Fastball Holdings, and PandaCo (collectively, the FanDuel defendants), moved to dismiss the complaint for failure to state a cause of action and based on documentary evidence (see CPLR 3211 [a] [1], [7]). The FanDuel defendants argued that under the internal affairs doctrine of choice of law, Scots law applied to plaintiffs' claims, which arose from the relationships between and among the directors and shareholders of an entity incorporated in Scotland. The FanDuel defendants next asserted that under Scots law, plaintiffs' claims, which sounded in alleged duties owed by directors to shareholders as well as duties owed among shareholders, were not cognizable. Lastly, they argued that plaintiffs failed to state a claim even if New York law applied. In support of their motion, the FanDuel defendants submitted the affirmation of Lord James Edward Drummond Young, a retired Judge of the Supreme Courts of Scotland, to explain how Scots law would apply to the asserted claims. Lord [*5]Drummond Young opined that under Scots law, plaintiffs' claims against the director defendants were not cognizable because directors owed duties only to the company as a whole rather than to the shareholders specifically.[FN8] Acknowledging that in special factual circumstances such a duty could arise, Lord Drummond Young opined that in the instant case no special relationship arose between the director defendants and plaintiffs. KKR and Shamrock separately moved to dismiss the complaint for similar reasons asserted by the FanDuel defendants.{**42 NY3d at 334}
Plaintiffs opposed the motion, arguing that the internal affairs doctrine was inapplicable and that, even if it did apply, New York law should nonetheless control under choice-of-law principles because New York had a greater interest in the litigation. As relevant here, plaintiffs contended, citing Greenspun v Lindley (36 NY2d 473 [1975]), that pursuant to New York's interest analysis for determining the applicable law in tort cases, FanDuel's significant contacts with this state required the application of New York substantive law to their claims. Plaintiffs argued that they adequately stated causes of action under New York law. In support of their fallback argument that their claims could survive the application of Scots law, plaintiffs submitted the affirmation of King's Counsel David Michael Thomson, a Scottish corporate attorney, to contest Lord Drummond Young's interpretation of Scots law. Although Thomson agreed with Lord Drummond Young that directors generally owe duties only to the company as a whole, he asserted that the complaint sufficiently alleged special factual circumstances creating fiduciary obligations between the director defendants and plaintiffs.
Supreme Court granted the FanDuel defendants' motion to the extent of dismissing the fifth cause of action and otherwise denied it, and granted KKR and Shamrock's motion to the extent of dismissing the third and fifth causes of action and otherwise denied it (see 2022 NY Slip Op 30187[U] [Sup Ct, NY County 2022]). The court held that New York law applied to plaintiffs' claims because the internal affairs doctrine was inapplicable "where the defendants are not current officers, directors and shareholders" at the time of the lawsuit (id. at *16). The court further held that, with respect to plaintiffs' claims against FanDuel Group, PandaCo, and the Fastball defendants, these entities were never directors or shareholders of FanDuel, and the doctrine was accordingly inapplicable to them as well (id. at *17). [*6]Proceeding to the merits, the court held that under New York law, plaintiffs adequately stated their claims for breach of fiduciary duty as against the director defendants and their claim for aiding and abetting a breach of fiduciary duty as against KKR, Shamrock, FanDuel Group, PandaCo, and Fastball, and that defendants' documentary evidence did not refute these allegations (id. at *17-21, *23-26). However, the court held that plaintiffs failed to state a cause of action for breach of fiduciary duty against KKR and Shamrock or for{**42 NY3d at 335} unjust enrichment. Defendants appealed the order to the extent that it denied their motions to dismiss (id. at *21-23, *26).[FN9]
The Appellate Division reversed the order to the extent appealed from and granted defendants' motions (see 209 AD3d 486 [1st Dept 2022]). The Court first held that plaintiffs' claims against the director defendants for breaches of fiduciary duty were governed by Scots law under the internal affairs doctrine (id. at 487-488). Noting that FanDuel was incorporated in Scotland, the Court explained that "relationships between a company and its directors and shareholders are generally governed by the substantive law of the jurisdiction of incorporation" (id. at 487). The Court rejected plaintiffs' "argument that the internal affairs doctrine applies only to officers and directors at the time of the lawsuit," and instead held that the doctrine applied so long as the defendants were directors "at the time of the events giving rise to the lawsuit" (id.).
On the merits, the Court stated that defendants had "submitted ample evidence sufficient to prove the substance of Scots law," and held that under Scots law, directors only owed fiduciary duties to the company rather than the shareholders except in "special circumstances . . . not present here" (id. at 487, 488). Accordingly, the Court concluded that plaintiffs failed to state a claim for breach of fiduciary duty under Scots law and further, that plaintiffs' aiding and abetting claim could not be sustained absent this underlying breach of fiduciary duty.[FN10] We granted plaintiffs leave to appeal (39 NY3d 916 [2023]).
III.
Generally, under New York choice-of-law principles, courts apply the law of the forum to procedural questions (see Davis v Scottish Re Group Ltd., 30 NY3d 247, 252 [2017]) and, to substantive issues, the law of the jurisdiction with [*7]the most significant relationship to the dispute (see Indosuez Intl. Fin. v National Reserve Bank, 98 NY2d 238, 245 [2002]; Matter of Allstate Ins. Co. [Stolarz—New Jersey Mfrs. Ins. Co.], 81 NY2d 219, 225-226 [1993]). In contract disputes, courts apply a "center of gravity or grouping of contacts" test to determine {**42 NY3d at 336}which jurisdiction—New York or a foreign state—has "the most significant relationship to the transaction and the parties" (Zurich Ins. Co. v Shearson Lehman Hutton, 84 NY2d 309, 317 [1994] [internal quotations marks and citation omitted]). In cases sounding in tort, the relevant inquiry is which forum has the greatest policy interest in the outcome of the dispute in light of the parties' contacts with each forum (see Edwards v Erie Coach Lines Co., 17 NY3d 306, 318 [2011]; Babcock v Jackson, 12 NY2d 473, 481, 484 [1963]). If the rule of tort law at issue "regulate[s] primary conduct," the law of the place of the tort's commission will typically govern (Cooney v Osgood Mach., 81 NY2d 66, 72 [1993]). If, on the other hand, the rule governs the allocation of loss after the occurrence of a tort, courts will consider factors such as the parties' domiciles and the location of the tort to determine which state has the greater interest in the dispute (see id.; Schultz v Boy Scouts of Am., 65 NY2d 189, 197-198 [1985]).
With respect to matters arising from the internal affairs of a corporation, as in this case, including the relationships between directors and shareholders,[FN11] this Court has noted that the "general[ ]" approach is to apply the law of the state of incorporation (Zion v Kurtz, 50 NY2d 92, 100 [1980]; see Davis, 30 NY3d at 253; see also Diamond v Oreamuno, 24 NY2d 494, 503-504 [1969]; Russian Reins. Co. v Stoddard, 240 NY 149, 154 [1925]). The United States Supreme Court has explained the policy underlying the internal affairs doctrine as ensuring that "only one [s]tate should have the authority to regulate a corporation's internal affairs—matters peculiar to the relationships among or between the corporation and its current officers, directors, and shareholders—because otherwise a corporation could be faced with conflicting demands" (Edgar v MITE Corp., 457 US 624, 645 [1982]). In other words, the doctrine "serves the vital need for a single, constant[,] and equal law to avoid the fragmentation of continuing, interdependent internal relationships" (McDermott Inc. v Lewis, 531 A2d 206, 216 [Del 1987], quoting P. John Kozyris, Corporate Wars and Choice of Law, 1985 Duke LJ 1, 98 [1985]; see also Hart v General Motors [*8]Corp., 129 AD2d 179, 184 [1st Dept 1987] [absent the doctrine, "every (s)tate might seek to judge the same board of{**42 NY3d at 337} directors' decision under different public policy standards"]). In addition to providing consistency to legal obligations, the internal affairs doctrine also protects the interests and expectations of shareholders by giving effect to their choice as to what jurisdiction's laws will govern the corporation's affairs (see Hart, 129 AD2d at 184; see also Greenspun, 36 NY2d at 477).
Although the internal affairs doctrine has been framed as a rule of general application in New York, we have not had occasion to address the situations in which it might not apply to claims involving corporate governance. In Greenspun, the Court addressed a choice-of-law problem in a dispute involving a business trust where the plaintiff sought an accounting by the defendant trustees to an investment trust for damages stemming from the trustees allegedly making investment decisions that were in the interest of a third party, rather than the trust (36 NY2d at 476). The Court first noted that the law of the state of the trust's organization, Massachusetts, was "prima facie" applicable because the trust was organized under the laws of Massachusetts, and the declaration provided that the law of Massachusetts would apply to determining the rights of the parties (id. at 477). Next, the Court, "continuing [its] inquiry," noted that the record was "barren of proof of a significant association or cluster of significant contacts . . . to support a finding of [a] 'presence' " in New York as "would, irrespective of other considerations, call for the application of New York law" (id.). Specifically, the Court explained that it had no information as to where the trust performed its business, where its principal office and records were located, the places where the trustees met, how many of the trust's shareholders lived in New York, or "other facts on which a finding of such 'presence' in New York State might be predicated" (id.). The Court
"reject[ed] any automatic application of the so-called 'internal affairs' choice-of-law rule, under which the relationship between shareholders and trustees of a business trust by strict analogy to the relationship between shareholders and directors of a business corporation would be governed by the law of the [s]tate in which the business entity was formed" (id. at 478).
Instead, the Court "expressly le[ft] open what law . . . might apply" were there proof of "significant contacts with New York {**42 NY3d at 338}State [such] that this investment trust, although a Massachusetts business trust, was nonetheless so 'present' in our [s]tate as perhaps to call for the application of New York law" (id. at 477-478). A few years later, in Zion, the Court, citing Greenspun without elaboration, applied Delaware law to a dispute between the shareholders [*9]and directors of a Delaware corporation as "that is the generally accepted choice-of-law rule with respect to such 'internal affairs' " (50 NY2d at 100).
Many state and federal courts in New York have relied on Greenspun and Zion for the proposition that New York generally, but not irrebuttably, applies the internal affairs doctrine in cases involving corporations and the actions of their directors (see e.g. Hau Yin To v HSBC Holdings, PLC, 700 Fed Appx 66 [2d Cir 2017] [summary order]; Hart, 129 AD2d at 184-185; Norlin Corp. v Rooney, Pace Inc., 744 F2d 255, 263 [2d Cir 1984]; Stephens v National Distillers & Chem. Corp., 1996 WL 271789, *4-5, 1996 US Dist LEXIS 6915, *12-13 [SD NY, May 21, 1996, No. 91 CIV 2901 (JSM), 91 CIV 2902 (JSM)]; Rottenberg v Pfeiffer, 86 Misc 2d 556, 558-559 [Sup Ct, Nassau County 1976], affd 59 AD2d 756 [2d Dept 1977]). However, courts have provided varying descriptions of the degree of interest that would be required to overcome the doctrine. For example, in Norlin, the shareholders brought an action to enjoin the board from voting shares owned by plaintiff's—a Panama corporation—subsidiary. The Second Circuit was "not so certain . . . that a New York court would apply the internal affairs rule and decide this case by reference to Panama law" (Norlin, 744 F2d at 263). The court interpreted Greenspun as requiring an evaluation of the company's contacts with New York, which were "far from insubstantial" (id.). The court, however, ultimately avoided the issue, because it determined that Panama would not apply its own law to the dispute and, in any event, New York and Panama law mandated the same result (id. at 264). More recently, the Second Circuit has refined its interpretation of New York choice-of-law principles implicating the internal affairs doctrine:
"The 'internal affairs doctrine'—a species of interest analysis—provides that the place of incorporation generally has the greatest interest in having its law apply to questions regarding the internal affairs of a corporation, such as 'the relationship between shareholders and directors.' Although New York courts reject a per se application of the{**42 NY3d at 339} internal affairs doctrine, they generally apply the law of the place of incorporation unless another state has an 'overriding interest' in applying its own law and a defendant has 'little contact, apart from the fact of its incorporation, with the state of incorporation' " (Hau Yin To, 700 Fed Appx at 68-69 [citations omitted]).
Scores of other state and federal cases have applied the internal affairs doctrine to require the application of the law of the place of incorporation, even after Greenspun (see e.g. Lerner v Prince, 119 AD3d 122, 128 [1st Dept 2014]; Kikis v McRoberts Corp., 225 AD2d 455, 455 [1st Dept 1996]; Glaubach v Slifkin, 171 AD3d 1019, 1022 [2d Dept 2019]; Graczykowski v Ramppen, 101 AD2d 978, 979 [3d Dept 1984]; Scottish Air Intl., Inc. v British Caledonian Group, PLC, 81 F3d 1224, 1234 [2d Cir 1996]; Mindspirit, LLC v Evalueserve Ltd., 346 F Supp 3d 552, 580 [SD NY 2018]; BBS Norwalk One, Inc. v Raccolta, Inc., 60 F Supp 2d 123, 129 [SD NY 1999]).
[1] Consistent with our precedent, we clarify that the substantive law of a company's place of incorporation presumptively applies to causes of action arising from its internal affairs. Moreover, because of the important interests that the internal affairs doctrine represents, we decline to create any broad exceptions to that presumption. Rather, in order to overcome this presumption and establish the applicability of New York law, a party must demonstrate both that (1) the interest of the place of incorporation is minimal—i.e., that the company has virtually no contact with the place of incorporation other than the fact of its incorporation, and (2) New York has a dominant interest in applying its own substantive law.[FN12] The simple balancing of contacts that plaintiffs propose would undermine the important interests of consistency and predictability that are critical to the internal affairs of a corporation. This method could result in a company's directors being subject to conflicting duties, and the law applicable to their actions{**42 NY3d at 340} changing depending on where suit is brought and who the plaintiffs might be. It could also lead the applicable law to depend on highly variable factors such as where a deal is negotiated, where its records are kept, and where its shareholders live.
Plaintiffs' allegations involve the internal affairs of FanDuel. Their complaint centers around the valuation of merger consideration by the director defendants in the course of approving a merger agreement and their legal duties to certain shareholders as it pertains to those actions. Thus, we begin with the presumption that Scots law, the law of FanDuel's place of incorporation, applies to plaintiffs' claims. Even accepting plaintiffs' allegations as true, neither requirement is met here to overcome this presumption. FanDuel has considerable contacts with Scotland. Five of the plaintiffs founded FanDuel in Scotland and registered the company under the Companies Act. FanDuel's Articles expressly referenced the Companies Act as the governing law, as did the agreement governing the distribution of the merger proceeds. FanDuel maintains offices in Scotland and a plurality of the plaintiffs live in Scotland. Moreover, [*10]New York does not have a dominant interest in applying its own law. Though FanDuel has its principal office in New York, held board meetings in this state, and negotiated the merger here, only 10-15% of FanDuel's total revenue was derived from New York customers. This is simply not a situation where New York has an overriding interest in applying its own law to plaintiffs' breach of fiduciary duty claims. Accordingly, the Appellate Division properly held that Scots law applies to these claims.
IV.
Next, the Appellate Division did not err in taking judicial notice of foreign law under these circumstances. At common law, courts did not judicially notice foreign law. Rather, parties were required to plead and prove it as a matter of fact (see Croker v Croker, 252 NY 24, 26 [1929]; Hanna v Lichtenhein, 225 NY 579, 582 [1919]). In 1943, the legislature enacted former Civil Practice Act § 344-a, which allowed courts discretion to take judicial notice of the law of a sister state or foreign country. It made foreign law determinations questions of law for the judge to decide, rather than fact for the jury, providing that foreign law "shall be determined by the court or referee and included in its findings, or charged to the jury as the case{**42 NY3d at 341} may be" (former Civ Prac Act § 344-a [B]). In 1963, former Civil Practice Act § 344-a was replaced by CPLR 4511. Subdivision (b) provides that "[e]very court may take judicial notice . . . of . . . the laws of foreign countries or their political subdivisions." "Judicial notice shall be taken of [such] matters . . . if a party requests it, furnishes the court sufficient information to enable it to comply with the request, and has given each adverse party notice of [their] intention to request it" (CPLR 4511 [b]). "Whether a matter is judicially noticed or proof is taken, every matter specified in [CPLR 4511] shall be determined by the judge . . . [,] included in [their] findings or charged to the jury . . . [,] [and] subject to review on appeal as a finding or charge on a matter of law" (id. § 4511 [c]). "In considering whether a matter of law should be judicially noticed and in determining the matter of law to be judicially noticed, the court may consider any testimony, document, information[,] or argument on the subject, whether offered by a party or discovered through its own research" (id. § 4511 [d]).
CPLR 4511 gives courts "substantial flexibility in determining whether to take judicial notice of foreign law and ascertaining its content" (Vincent C. Alexander, Prac Commentaries, McKinney's Cons Laws of NY, CPLR 4511). As the statutory language notes, a court must take judicial notice of foreign law upon request and if the court is furnished with sufficient information to do so; otherwise, a court may take judicial notice of foreign law in its [*11]discretion (see Lerner v Karageorgis Lines, 66 NY2d 479, 487-488 [1985]). However, the actual content of foreign law is treated as a question of law (CPLR 4511 [c]; Rosman v Trans World Airlines, 34 NY2d 385, 392 [1974]; Gevinson v Kirkeby-Natus Corp., 26 AD2d 71, 74 [1st Dept 1966]). Indeed, the "construction of foreign law is a legal question that may be appropriate for summary resolution when sufficient information based on documentary and other evidence is presented" (Sea Trade Mar. Corp. v Coutsodontis, 111 AD3d 483, 484 [1st Dept 2013] [internal quotation marks omitted]; see also Rosman, 34 NY2d at 392).
A court should consider the merits of expert affidavits and other submitted materials, make a determination as to their sufficiency, and take judicial notice of foreign law as it deems appropriate. In making this "sufficiency" determination, a court must consider not just the materials submitted by the party making the request, but those materials provided by the non-requesting party in opposition, including contrary authority or{**42 NY3d at 342} material which supports their own request. While the court, in its discretion, might defer decision on the motion and choose to hold a hearing so that it may conduct additional inquiry into the foreign law question, we hold that such a hearing is not mandated as a matter of course. Nothing in the text of CPLR 4511 or other CPLR provisions purports to require a hearing when there is a dispute as to the content of foreign law so long as the court has "sufficient information" to determine that law without one. Indeed, the idea that a hearing is required and a motion to dismiss must be denied or deferred every time there is some dispute regarding foreign law contravenes CPLR 4511's goal of treating foreign law as a legal issue, rather than a factual one. Nonetheless, a court taking judicial notice of foreign law should always endeavor to provide detailed findings as to what the law of the foreign jurisdiction is and how it applies to the case at hand in order to facilitate appellate review (see CPLR 4511 [c]).
[2] In this case, the foreign jurisdiction's laws and cases are written in English, and the applicable principles derive from English common law. Additionally, the parties have provided voluminous materials—including expert affidavits, relevant statutes, and dozens of cases, which cogently explain the relevant principles. The dispute between the experts centers more around the application of Scots law to the facts of this case rather than the substance of Scots law. Under these circumstances, the Appellate Division did not err in determining that it had sufficient information to take judicial notice of Scots law for the purpose of resolving defendants' motions to dismiss and did not abuse its discretion in doing so without remitting for a hearing.
[*12]V.
We finally turn to whether, applying Scots law, plaintiffs' claims survive defendants' motions to dismiss for failure to state a cause of action. As noted, although Scots law governs the substantive issues, we apply New York procedural rules (see Davis, 30 NY3d at 252). "On a motion to dismiss pursuant to CPLR 3211, the pleading is to be afforded a liberal construction" (Leon, 84 NY2d at 87, citing CPLR 3026). Courts must "accept the facts as alleged in the complaint as true, accord plaintiffs the benefit of every possible favorable inference, and determine only whether the facts as alleged fit within any cognizable legal theory" (id. at 87-88). "In assessing a motion {**42 NY3d at 343}under CPLR 3211 (a) (7), . . . the criterion is whether the proponent of the pleading has a cause of action, not whether [they have] stated one" (id. at 88 [internal quotation marks and citation omitted]; accord Maddicks v Big City Props., LLC, 34 NY3d 116, 123 [2019]). "Whether a plaintiff can ultimately establish its allegations is not part of the calculus in determining a motion to dismiss" (EBC I, Inc. v Goldman, Sachs & Co., 5 NY3d 11, 19 [2005]). Still, "conclusory allegations—claims consisting of bare legal conclusions with no factual specificity—are insufficient to survive a motion to dismiss" (Godfrey v Spano, 13 NY3d 358, 373 [2009]). Moreover, as explained above, in analyzing this issue, we must review the relevant requirements of Scots law de novo, in accordance with CPLR 4511. A defendant is entitled to dismissal pursuant to CPLR 3211 (a) (1) only if the documentary evidence "utterly refutes [the] plaintiff's factual allegations, conclusively establishing a defense as a matter of law" (Goshen v Mutual Life Ins. Co. of N.Y., 98 NY2d 314, 326 [2002]).
Under Scots law, to state a claim for breach of fiduciary duty, a plaintiff must demonstrate (1) that the defendant owes them a fiduciary duty, (2) that the defendant has breached that duty, (3) damages, and (4) causation (22 The Laws of Scotland: Stair Memorial Encyclopaedia ¶ 174).[FN13] At issue in this case is the first requirement: whether the director defendants owed plaintiffs any fiduciary duty.
Chapter 2 of part 10 of the Companies Act outlines directors' duties, and sections 171 to 177 specifically govern the duties "owed by a director of a company to the company" (Companies Act 2006, ch 46, § 170). Those include, among others, the duties to "act in accordance with the company's constitution" and "only exercise powers for the purposes for which they are conferred" (id. § 171 [a], [b]). When exercising these duties, a director must "act in the way [they] consider[ ], in good faith, would be most likely to promote the success of the company for the benefit of its members as a whole," taking into account "the need to act fairly as between members of the company" (id. § 172 [1], [1] [f]) and "exercise independent judgment" (id. § 173 {**42 NY3d at 344}[1]). Though superseding the common law regarding directors' [*13]duties to a company, the duties in the Companies Act are to be "interpreted and applied in the same way as common law rules or equitable principles" (id. § 170 [3]-[4]).
As an initial matter, "[n]o action lies at the suit of a shareholder suing in that capacity and no other to make good a diminution in the value of the shareholder's shareholding where that merely reflects the loss suffered by the company" (Johnson v Gore Wood & Co. [2000] UKHL 65, [2002] 2 AC 1, 19 [Lord Bingham of Cornhill]). But here, plaintiffs allege that the common shareholders of FanDuel suffered a unique harm because the director defendants' actions prevented them from receiving any consideration based on the merger. Notably, plaintiffs do not allege that the merger harmed the company. Rather, they assert that the valuation of FanDuel was manipulated and depressed in a manner which resulted in KKR and Shamrock receiving a financial windfall of the merger and plaintiffs receiving nothing for their valuable contributions and ownership interests. Thus, the harm alleged was not inflicted on FanDuel as a company, nor on the entire body of shareholders. This is therefore not a case of plaintiffs attempting to impermissibly repackage a derivative claim against the company as a direct one.
Under the relevant English common-law principles, a director does not owe any fiduciary duties directly to the shareholders solely based on his or her relationship to the company (see Peskin v Anderson [2000] EWCA [Civ] 326, [28]-[30], [33], [2001] BCC 874 at 879-880 [Mummery LJ] [Eng.], citing Percival v Wright [1902] 2 Ch 421). However, "the precept that directors' duties are not owed to individual shareholders applies only to those duties which directors are subject to simply by virtue of their appointment and actions as directors" (Paul L. Davies et al., Gower: Principles of Modern Company Law § 10-006 [11th ed 2021]). Indeed,
"there may be special circumstances in which a fiduciary duty is owed by a director to a shareholder personally and in which breach of such a duty has caused loss to [the shareholder] directly . . . as distinct from loss sustained . . . by a diminution in the value of [the shareholder's] shares . . . for which [the shareholder] . . . would not have a cause of action against the director personally" (Peskin {**42 NY3d at 345}v Anderson [2000] EWCA [Civ] 326 [32], [2001] BCC at 880).
These fiduciary duties do not arise "from the legal relationship between the directors and the company," but are "dependent on establishing a special factual relationship between the directors and the shareholders in the particular case" based on "well established categories of fiduciary relationships" (Peskin v Anderson [2000] EWCA [Civ] 326 [33]-[34], [2001] BCC at 880).
"Events may take place which bring the directors of the company into direct and close contact with the shareholders in a manner capable of generating fiduciary obligations, such as a duty of disclosure of material facts to the shareholders, or an obligation to use confidential information and valuable commercial and financial opportunities, which have been acquired by the directors in that office, for the benefit of the shareholders, and not to prefer and promote their own interests at the expense of the shareholders" (Peskin v Anderson [2000] EWCA [Civ] 326 [33], [2001] BCC at 880).
Courts have identified several types of cases that fall within the "special circumstances" rubric, such as close familial relationships (see Coleman v Myers [1977] 2 NZLR 225 [CA]; Brunninghausen v Glavanics [1999] NSWLR 538 [Court of Appeal] [Austl.]) and instances in which the directors are acting, in effect, as the agents of the shareholders (see Allen v Hyatt [1914] 30 TLR 444 [PC] [appeal taken from Ont.]). However, given that these cases inherently involve unusual situations that require special treatment, seemingly no court has given an exhaustive account of what would, and would not, constitute a "special circumstance" (but see Sharp v Blank [2015] EWHC 3220 [10], [2017] BCC 187 at 193-195 [Ch] [summarizing "special circumstance" case law]). Indeed, the "question is one of fact in each case" (Victor Joffee et al., Minority Shareholders § 3.55 [6th ed 2018]).
[3] Plaintiffs' allegations—viewed in their most favorable light and according them every possible favorable inference—are sufficient to state a claim that the director defendants at least owed limited fiduciary duties to plaintiffs. Most relevant to this conclusion is the interaction between the waterfall provision and KKR and Shamrock's drag-along rights, which left the common shareholders in an especially vulnerable position. Taken together, this arrangement could give rise to an inference{**42 NY3d at 346} that the directors, in being vested with the power to negotiate a merger agreement and subsequently value intangible merger consideration, undertook a duty not to undermine the common shareholders' interests in those transactions, much less to do so for their own self-interest (see Allen v Hyatt [1914] 30 TLR 444; Principles of Modern Company Law § 10-006 [noting that special circumstances "may arise, for example, where the shareholders authorize the directors to sell their shares on their behalf to a potential takeover bidder"]). In effect, the directors could be deemed entrusted with properly valuing and distributing any merger consideration so as to protect the common shareholders' interest in any corporate value in excess of $559 million. If no such limited duty existed, and plaintiffs' allegations were true, we would in effect be holding that, by authorizing the FanDuel restructuring, plaintiffs agreed that the directors should be allowed to "prefer and promote their own interests at the expense of the" common shareholders by intentionally undervaluing the merger consideration (Peskin v Anderson [2000] EWCA [Civ] 326 [33], [2001] BCC at 880). Based on the foregoing legal principles, we do not think a Scottish court, accepting the factual allegations as true and affording plaintiffs the benefit of every possible inference, would determine that plaintiffs had failed to state a cause of action. Rather we conclude, based on the unique circumstances of this case, that plaintiffs' allegations at least give rise to a possible inference that special circumstances are present, and defendants' documentary evidence does not utterly refute these allegations. However, as we have explained, the existence and extent of any duty will be heavily dependent on plaintiffs proving the factual allegations in their complaint.
VI.
The Appellate Division properly concluded that Scots law applies, and correctly determined that it could take judicial notice of that law and apply it. However, because, under New York's liberal pleading standard, plaintiffs' complaint can be read to allege a "special circumstance" that could give rise to a cognizable fiduciary duty claim under Scots law, the Appellate Division erroneously granted defendants' motions to dismiss the first, second, and fourth causes of action. Accordingly, the order of the Appellate Division should be reversed, with costs, and so much of the order of Supreme Court as denied defendants' motions to dismiss the complaint reinstated.{**42 NY3d at 347}
Chief Judge Wilson and Judges Rivera, Cannataro, Troutman, Reynolds Fitzgerald[FN*] and Iannacci[FN*] concur. Judges Garcia and Halligan took no part.
Order reversed, with costs, and so much of the order of Supreme Court, New York County, as denied defendants' motions to dismiss the complaint reinstated.

Footnotes

Footnote 1:The facts in part I are recounted accepting—as we must on this motion to dismiss—plaintiffs' factual allegations as true (see Leon v Martinez, 84 NY2d 83, 87 [1994]).

Footnote 2:Defendants FanDuel Inc. and FanDuel Group, Inc. (collectively, FanDuel Group), together operate as the corporate form of PandaCo.

Footnote 3:For purposes of this calculation, the draft term sheet assigned FanDuel an equity value of $514.1 million multiplying its revenue by four and subtracting the company's net debt. It assigned Paddy Power's United States assets an equity value of $679.1 million multiplying its EBITDA (earnings before interest, taxes, depreciation, and amortization) by 18 and adding the $145 million in cash Paddy Power had agreed to contribute to the newly formed entity.

Footnote 4:According to the complaint, LaSalle was appointed to the FanDuel board in 2014 by Shamrock Capital Advisors, LLC, where he was a partner. Oberwager was appointed to the board in 2015 by KKR & Co., Inc., where he was a director. Cleland was appointed to the board by Comcast Ventures, which owned over 14% of the preferred shares. King previously served as a director of KKR & Co., Inc., and owned preferred shares. Vogel was allegedly appointed based on his relationship with KKR & Co., Inc., where he served as an advisor, and stood to gain a "sizeable management carve-out" upon completion of the merger. Each allegedly held an indirect interest in the merger through private equity funds that held preferred shares. Nathanson was allegedly appointed based on his relationship with Shamrock Capital Advisors, LLC, and also stood to gain from the management carve-out.

Footnote 5:The Drag Along Notice was signed by Oberwager on behalf of KKR and LaSalle on behalf of Shamrock.

Footnote 6:Plaintiffs are residents of Scotland, England, New York, California, Florida, Massachusetts, Texas, Pennsylvania, New Jersey, Indiana, Washington, Connecticut, Illinois, Tennessee, Virginia, Utah, Nevada, Minnesota, Arizona, and Delaware.

Footnote 7:The second cause of action alleged that King breached additional duties in his role as CEO.

Footnote 8:Under New York law, directors of a corporation owe fiduciary duties to the body of shareholders to protect their ownership interests (see Giblin v Murphy, 73 NY2d 769, 771 [1988]) and to act in good faith, "treat[ing] all shareholders, majority and minority, fairly" (Alpert v 28 Williams St. Corp., 63 NY2d 557, 569 [1984]).

Footnote 9:Plaintiffs did not cross-appeal Supreme Court's order. Thus, whether the third and fifth causes of action were properly dismissed was not before the Appellate Division and is not before us on this appeal.

Footnote 10:On this appeal, defendants do not challenge the Appellate Division's conclusion that Scots law would not apply to plaintiffs' aiding and abetting claim.

Footnote 11:Internal affairs also generally "involve a corporation's organic structure or internal administration," including "steps taken in the course of the original incorporation, . . . mergers, consolidations, and reorganizations" (Restatement [Second] of Conflict of Laws § 302, Comment e).

Footnote 12:The Restatement (Second) of Conflicts of Law provides a helpful analytical framework that mirrors how we have treated New York's choice-of-law analysis in this context. The law of the state of incorporation should generally control corporations' internal affairs "except in the unusual case where, with respect to the particular issue, some other state has a more significant relationship to the occurrence and the parties" (Restatement [Second] of Conflict of Laws § 302 [2]; see also Comment g [explaining that such situations are "extremely rare" and typically require both an "overriding" interest and "little contact with the state of incorporation"]).

Footnote 13:While Scotland has a hybrid civil and common-law system, the parties agree that fiduciary duties in the corporate context are governed by the Companies Act and common law. The parties agree that the issue of the fiduciary duties owed by directors of Scottish companies to their shareholders is practically identical, and should be evaluated by reference, to English common law.

Footnote *:Designated pursuant to NY Constitution, article VI, § 2.

Footnote *: